**William CAPOZZI, Plaintiff,**

v.

**The CITY OF OLEAN, NEW YORK; City of Olean, New York, Department of Code Enforcement; Ronald M. Blakeslee, individually and in his official capacity as Olean Code Enforcement Officer; City of Olean, New York, Police Department; Patrick Brandow, individually and in his official capacity as Olean Chief of Police; Unknown Police Officers, individually and in their official capacity as Olean Police Officers; City of Olean, New York, Fire Department; John W. Gibbons, individually and in his official capacity as Olean Fire Chief; Paul Melfi, individually and in his official capacity as Acting Olean Fire Chief; John M. Hart, Jr., individually and in his official capacity as Olean City Attorney, Defendants.**

No. 94–CV–850A.

United States District Court, W.D. New York.

Nov. 28, 1995.

been considered and found to be without merit.

Legal Services for the Elderly, Disabled or Disadvantaged of Western New York, Inc. (William W. Berry, of counsel), Buffalo, New York, for Plaintiff.

Law Offices of Charles G. DiPasquale (Paul F. Murak, of counsel), Buffalo, New York, for Defendants.

## DECISION AND ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

A consent to proceed before the undersigned was filed in this matter on August 2, 1995. The matter is presently before the court on Plaintiff's motion for partial summary judgment, dated October 30, 1995, and Defendant's cross-motion for summary judgment, dated November 1, 1995.

### BACKGROUND

Plaintiff, William Capozzi, filed this action under 42 U.S.C. § 1983 on November 21, 1994, alleging that his constitutional rights were violated when Defendants unreasonably entered his home without a warrant and ordered him to vacate the premises without adequate pre- or post-deprivation remedies. Defendants contend the entry was reasonable under the circumstances presented, and that he was given adequate remedies as required under the United States Constitution.

Trial is scheduled to commence in this matter on December 4, 1995. On October 30, 1995, Plaintiff filed a motion for partial summary judgment seeking a determination that Defendants the City of Olean, New York, the City of Olean, New York Department of Code Enforcement ("DCE"), the City of Olean, New York Fire Department ("Fire Department"), John W. Gibbons, and Paul Mel-

fi, intentionally deprived Plaintiff of property without due process of law in violation of Plaintiff's rights under the Fourteenth Amendment, and additionally seeking an award of nominal damages of one dollar against either or both John W. Gibbons and Paul Melfi in their individual capacities, along with an award of attorney's fees and costs.

Thereafter, on November 1, 1995, Defendants filed a motion for summary judgment on the ground that Plaintiff had failed to state a claim against any Defendant; for summary judgment upon the grounds of qualified immunity for each individual named Defendant; or, alternatively, for partial summary judgment dismissing the punitive damages claim against any individual Defendant.[1]

Oral argument on the matter was held on November 13, 1995.

For the reasons as set forth below, Plaintiff's motion for summary judgment is DENIED. Defendants' cross-motion for summary judgment is GRANTED in part and DENIED in part.

### FACTS

Plaintiff, William Capozzi, on the date of the incident at issue in this lawsuit, was the owner of and resided at a two-family home located at 510 North Sixth Street in the City of Olean, New York. Capozzi was, at that time, seventy-two years of age.[2]

On December 23, 1993, at approximately 12:05 p.m., in response to a telephone call received from Christy Sherlock, the resident living at 514 North Sixth Street located next door to Capozzi's home, that she had not seen Capozzi for approximately a week and a half to two weeks, see Exhibit B, Affidavit in Opposition to Defendants' Motion for Summary Judgment, Deposition of Christy Sherlock, at pp. 11, 27, City of Olean Police Officer Timothy Gore was dispatched to Sherlock's home to investigate. Sherlock ad-

---

1. Plaintiff argues that the motion should be denied as untimely, as the court's scheduling order directed that all dispositive motions be filed no later than October 30, 1995. The court, in its discretion, however, has decided that, in the interest of judicial economy, Defendants' motion should be heard on the merits as it raises issues that could also be properly raised at trial.

2. The fact statement is taken from the papers filed relative to the summary judgment motions filed in this case, along with the Complaint.

vised Gore that Capozzi, an elderly gentleman, lived alone, and that she believed that he was inside the home, but that she had not seen him for some period of time. Officer Gore went over to 510 North Sixth Street, Capozzi's home, and knocked on the doors, calling to Capozzi, but received no answer. Gore then returned to Sherlock's home, and contacted his supervisor, Edwin Triesky.

After speaking to Gore, Triesky contacted the Olean Department of Fire, Buildings, and Emergency Services. Firefighters Robert Bartholomew and Steven Wolfe were dispatched, and acting Fire Chief Paul Melfi went along to assist, arriving at the Capozzi home at approximately 1:11 p.m.

The firefighters used a hydraulic ram to force open the rear upper door of Capozzi's home, a device that separates the door frame from the locks without breaking the components. At the time of entry, Capozzi was in his bed, however, the entry awakened him and he met with the firefighters and Officer Gore. The officers noted that at the time of entry there was no heat in the building, despite the very cold December temperatures.[3] The only heat apparently was coming from one burner on a kitchen range where a large pot of water was heating. Captain Melfi stated that the interior of the home was in "terrible condition," *see* Exhibit G, Plaintiff's Notice of Motion, Statement of Captain Melfi, that articles of "everything imaginable," *Id.*, was piled from floor to ceiling, that the ceiling was collapsing in the kitchen because of water leaking after a tree fell on the structure, damaging the roof, and that the stove was packed full of papers, articles of clothing, and other items. While the officers were at the scene, Capozzi received a telephone call from a friend, indicating that his telephone was operable.

Richard Swift of the Cattaraugus County Department of Social Services, Adult Protective Services Division, and Wendy Jerge of the Cattaraugus County Department of Aging were summoned to the scene by the officers to assist Capozzi. Olean Code En-

forcement Officer Ronald Blakeslee[4] was also called to the scene by Captain Melfi so that the apparent structural and mechanical defects in the home could be inspected. Officer Blakeslee inspected the building and deemed it to be dangerous, later posting a sign on the exterior which characterized the structure as a "dangerous building." *See* Exhibit B, Plaintiff's Notice of Motion. According to Plaintiff, Blakeslee ordered him to leave the building, and directed that he discontinue residing in his home. Defendants deny that Blakeslee gave any such direction. Rather, Defendants contend that Capozzi was told that severe weather conditions made his continued occupation of the home, with no heat and leaking water, inadvisable, and that Capozzi did not protest. *See* Exhibit H, Plaintiff's Notice of Motion, at p. 16.

Adult Protective Services arranged for Capozzi to stay at the YMCA in Olean for the weekend, and that suitable housing would be found thereafter. The Society for the Prevention of Cruelty to Animals ("SPCA") was contacted to locate Capozzi's cat at his home. Prior to leaving the building, Captain Melfi contacted the Water Department to shut off the water so that the pipes would not freeze. The Water Department indicated that it could not shut off the water unless "water was running out the doors and windows." *See* Exhibit G, Plaintiff's Notice of Motion. Later in the day, another police officer, Lieutenant Mooney, was told to reenter the building to shut off the water. Lieutenant Mooney found Capozzi back in the house. Capozzi stated that he had come back for something to eat, and that he was checking on his house. According to Lieutenant Mooney, the water was not shut off because Capozzi directed him not to do so, although Capozzi disputes this statement. The water was eventually shut off from the curb, after a period of days.

On December 27, 1993, Capozzi came into the Cattaraugus County Department of Aging office quite upset with his situation. He stated that he had gone to his house, and

---

3. Christy Sherlock indicated that the weather that day was "very cold." Deposition of Christy Sherlock, at p. 44.

4. Blakeslee died on April 24, 1995, after this action was commenced. A Statement of Fact of Death was filed by defense counsel on November 1, 1995.

that his water pipes had frozen and burst, and that he was becoming "suicidal." *See* Exhibit A, Plaintiff's Notice of Motion. Capozzi was admitted to Olean General Hospital for observation, but was discharged on December 29, 1993. On January 5, 1994, Capozzi was moved from the YMCA to the Easton Apartments in Olean, a rooming house which charged $225 per month in rent. Capozzi was also put in touch with William W. Berry, Esq., of the Legal Services for the Elderly.

An Order to Remedy from Officer Blakeslee of the Department of Code Enforcement, dated December 28, 1993, was sent to Capozzi, by certified mail, with receipt on January 3, 1994, directing that the code violations be repaired by January 10, 1994. Capozzi was also served with a notice pursuant to Olean Code § 6–239 directing him to repair or demolish the building within thirty days of receipt of the notice. *See* Exhibit E, Plaintiff's Notice of Motion. Capozzi was not served with notice of a hearing pursuant to Olean Code § 6–240 as no written request for a hearing was received, nor did the building inspector serve a report of non-compliance on Capozzi or to the Olean Fire Chief. However, Mr. Berry, by letter dated January 31, 1994, requested that "any notice given by the Fire Chief pursuant to section 6–240 of the Olean Code be held in abeyance until we either work this matter out, or reach a definite impasse." *See* Exhibit E, Plaintiff's Notice of Motion, at p. 6. No hearing on the building's status was ever held.

### DISCUSSION

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evi-

dence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985).

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* 477 U.S. at 255, 106 S.Ct. at 2513; *Rattner, supra,* at 209.

Plaintiff has alleged that his civil rights were violated by Defendants under 42 U.S.C. § 1983. Pursuant to 42 U.S.C. § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.

In this case, Plaintiff contends that his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution were violated when Defendants entered his home without a warrant, ordered him to vacate his premises without notice, and did not provide him with the opportunity for a pre- or post-deprivation hearing. Defendants argue that they were responding to an emergency, that, upon arrival, it was apparent that Plaintiff's home was in a dangerous condition, and that Plaintiff and his attorney were provided an opportunity for contact with City of Olean officials, or their agents, but failed to request any hearing.

■ As a preliminary matter, the court notes that Capozzi has named as Defendants the City of Olean, New York, Department of Code Enforcement, the City of Olean Police Department, and the City of Olean Fire Department. As these entities are merely agencies or departments of the City of Olean, and the City of Olean is also named as a Defendant in this action, the court concludes that these agencies should be dismissed from

the case. *See Manning v. County of West-chester,* 1995 WL 12579 at *2 (S.D.N.Y.1995) (Westchester County Police Department removed as named defendant where the County of Westchester, as the real party in interest, was already a named defendant); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) (claim dismissed against New York City police department as the City of New York was the proper party in interest).

### 1. *Fourth Amendment claim*

 The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Arizona v. Evans,* —— U.S. ——, 115 S.Ct. 1185, 1191, 131 L.Ed.2d 34 (1995). The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Fourth Amend. The Fourth Amendment not only protects criminal suspects but also limits governmental intrusions in civil contexts. *See Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967); *Flatford v. City of Monroe,* 17 F.3d 162, 169 (6th Cir.1994). Generally, a warrant is required before a search and seizure may be conducted, unless one of the exceptions to the warrant requirement exists. *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

 One of the exceptions to the warrant requirement is the emergency exception. Under the emergency exception, a warrantless entry and search may be made in order to protect and preserve life. *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978). The Fourth Amendment does not bar police officers from making warrantless entries when they reasonably believe that a person is in

need of immediate aid. *Mincey, supra,* at 392, 98 S.Ct. at 2413. However, an entry and search made under this exception must be limited by the emergency that necessitated it. *Mincey, supra,* at 393, 98 S.Ct. at 2413.

In *McGee v. Bauer,* 1990 WL 114470 (N.D.Ill.1990), a neighbor telephoned police complaining of barking dogs, and a foul odor emanating from the plaintiff's home. The police officer arrived on the scene, smelling an overpowering odor from the house. Through the windows, the officer saw overturned furniture, animal waste, straw on the floor, and a thick layer of dust. Joined by his supervisor, the officers entered the home believing that the odor was that of a dead body. The officers, after searching the house, found a dead dog in the basement. The plaintiff, who was not at home at the time, returned to find evidence that his home had been searched. Following trial, a jury found that plaintiff's Fourth Amendment rights had not been violated by the officers warrantless entry into the home.

In this case, Plaintiff has sued "Unknown Police Officers,"[5] Acting Fire Chief Paul Melfi, and Olean Code Enforcement Officer Ronald Blakeslee for entering his home without a warrant in violation of the Fourth Amendment. Plaintiff has also sued Patrick Brankow, as the Olean Police Chief, on the basis of respondeat superior.

 The court has reviewed the deposition testimony of Christy Sherlock, the neighbor who first notified the police that she feared that Capozzi might be in distress, along with the statements from Officer Gore. Sherlock telephoned the police after she had not observed Capozzi leave or enter his home for over a week. Believing that Capozzi might be in distress, she telephoned the police department. Officer Gore was dispatched to investigate. It is undisputed that Gore, after speaking with Sherlock, went to the Capozzi home and repeatedly knocked on the front and back doors, shouting for Capozzi to answer. It is also undisputed that, despite lengthy attempts to make contact with Ca-

---

**5.** Plaintiff's counsel represents that, although he has not amended the complaint as such, that the

Unknown Police Officers are Officer Timothy Gore, and Sergeant Edwin Triesky.

pozzi, Capozzi did not answer. Gore did not attempt to telephone Capozzi, nor did he knock on the second story doors. However, it is not disputed that, although Capozzi's home was a two-family structure, this fact was not apparent from the outside. Only after he was unable to reach Capozzi did Gore return to Sherlock's home to telephone his supervisors to get further instructions. The court finds that Gore's attempts to rouse Capozzi prior to his ultimate entry into Capozzi's home were reasonable.

Additionally, the testimony elicited from Sherlock, *i.e.,* that her former brother-in-law was a firefighter for the City of Olean, and that the former owner of Sherlock's home told Sherlock that Capozzi's home was dangerous and run-down, does not create a genuine issue of material fact as to whether Sherlock had any bias against Capozzi. Sherlock's testimony was clear that she was only attempting to assist Capozzi. In fact, she stated that she was upset because "I did this because I was worried about somebody and now I feel like I'm on trial ... and I can really understand why people don't get involved." *See* Deposition of Christy Sherlock, at p. 48. No other evidence has been presented to show that Sherlock had any other motive, other than to assist Capozzi, when she made her contact with the Olean police department.

After Gore contacted his supervisors for further instructions, other officers and firefighters came to the scene, including Acting Fire Chief Melfi. Unable to contact Capozzi, they opened Capozzi's door with a hydraulic ram. Capozzi was discovered inside, in a building with no heat and in extreme disrepair. Assistance was obtained for Capozzi. Melfi then contacted Blakeslee, the Code Enforcement Officer, to observe the structure to determine its level of dangerousness. The court finds that the entry into the home by the police officers, Melfi, and Blakeslee was proper under the emergency exception to the warrant requirement of the Fourth Amendment. It was reasonable under the circumstances for the officers to believe that Capozzi was in need of immediate aid based on the fact that his next-door neighbor had not seen him, and that Officer Gore had attempted to reach Capozzi by personally knocking on front and back doors and calling out to him. Once in Capozzi's home, it was reasonable for Blakeslee to enter the home based on the request of Melfi, in order to determine whether the structure was too dangerous for habitation.

■ Once inside the house lawfully, under the plain view exception to the warrant requirement, it was proper for Blakeslee to remain in the house to inspect the structure, as emergencies may justify warrantless entries and searches, and evidence in plain view may be seized following such a lawful entry. *Sheik–Abdi v. McClellan,* 37 F.3d 1240, 1248 n. 7 (7th Cir.1994). As such, the court finds that Defendants Unknown Police Officers, Melfi, and Blakeslee did not violate Capozzi's Fourth Amendment rights when they entered Capozzi's home on December 23, 1993 without a warrant.

■ Plaintiff has also raised a claim against Brandow, the Olean Chief of Police, based on his supervisory responsibility. However, it is well settled that an individual cannot be liable under Section 1983 for a violation of a person's constitutional rights on the basis of *respondeat superior.* *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). A defendant's personal involvement in an alleged deprivation of constitutional rights is a necessary element of a Section 1983 complaint. *Al-Jundi v. Estate of Nelson Rockefeller,* 885 F.2d 1060, 1065–66 (2d Cir.1989).

■ A plaintiff may show that a supervising defendant is "personally involved" within the meaning of Section 1983 if the defendant: (1) directly participated in the infraction, (2) failed to remedy the violation after notification of the violation, (3) instituted a policy or custom which permitted such infractions to occur, or allowed the continuance of an unconstitutional policy or custom, (4) acted in a manner constituting gross negligence in the management of subordinates responsible for the unlawful acts, or (5) exhibited deliberate indifference by failing to act on information

that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

■ In this case, Plaintiff has simply stated that Brandow did not follow-up on the Capozzi investigation. However, where, as here, a plaintiff cannot show that a supervising individual had any personal involvement in the asserted constitutional violations, nor can he establish that the individual promulgated or was otherwise aware of any unconstitutional customs or policies, the claim against that individual must be dismissed. *Colon v. Coughlin, supra,* at 873–74; *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Parris v. Coughlin,* 1993 WL 328199 at *3 (N.D.N.Y.1993). Plaintiff has not established, other than by giving conclusory statements, that Brandow was aware of any violation of Capozzi's constitutional rights, or that Brandow promulgated any policies designed to violate Capozzi's constitutional rights. *See Colon v. Coughlin, supra,* at 873–74. As such, the claim against Brandow must fail.

### 2. *Fourteenth Amendment claim*

Capozzi also argues that his Fourteenth Amendment rights were violated by Defendants City of Olean, Blakeslee, Melfi, Gibbons, and Hart. Specifically, Capozzi claims that his due process rights were violated when his home was posted as uninhabitable and by not providing him with a predeprivation or a postdeprivation hearing.

■ The due process clause requires notice and a hearing prior to eviction. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). However, a prior hearing is not required where there is a special need for quick action to secure an important public interest, and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that the action was necessary and justified in a particular instance. *Fuentes, supra,* at 91, 92 S.Ct. at 2000. Additionally, the due process clause may be satisfied even though there has been a deprivation of property if the state provides a "suitable postdeprivation remedy." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82

L.Ed.2d 393 (1984). A suitable postdeprivation remedy requires that an opportunity to be heard at a meaningful time and in a meaningful manner be provided, though the timing and the nature of this hearing depends upon the nature of the individual circumstances. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433–34, 102 S.Ct. 1148, 1156–57, 71 L.Ed.2d 265 (1982).

■ First, as to Defendant Blakeslee, in this case, the City of Olean ordinance provides that a building inspector shall "inspect all public buildings ... and may inspect all other buildings and structures, including residences, for the purpose of determining whether any conditions exist which render such places a dangerous building within the terms of section 6–236." City of Olean Ordinance § 6–239(1). The ordinance also provides that a building inspector shall "notify in writing the owner ... of any building found by him to be a dangerous building within the standards set forth in section 6–236 that (a) the owner must vacate, repair, or demolish such building...." City of Olean Ordinance § 6–239(4). Section 6–236 defines a "dangerous building" to be "all buildings which have any or all of the following defects," including "those which have become or are so dilapidated, decayed, unsafe, unsanitary, or which so utterly fail to provide the amenities essential to decent living that they are unfit for human habitation." City of Olean Ordinance § 6–236(5).

It is undisputed that Blakeslee posted a notice pursuant to § 6–239(8) on December 23, 1993 stating that Capozzi's home had been found to be a dangerous building under § 6–236. *See* Exhibit C, Interrogatory Responses, at p. 8–9, ¶ 22. There is also no dispute that a notice, dated December 27, 1993, was sent to Capozzi directing him to remedy the violations at his home by January 10, 1994. *See* Exhibit B, Plaintiff's Notice of Motion.

Plaintiff claims that Blakeslee directed him to leave his home, and that Blakeslee did not provide him with an opportunity to be heard prior to the eviction, nor did he provide him with an immediate postdeprivation hearing. After reviewing the undisputed facts in this

case, the court finds that, by posting the dangerous building notices, Capozzi was deprived of a property interest and that, in doing so, Blakeslee was acting under color of state law. The question remains as to whether Blakeslee deprived Capozzi of property without due process of law, and whether Blakeslee is entitled to qualified immunity for his actions.

■ Qualified immunity shields government officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288 (2d Cir.1990). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective level of reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Once disputed factual issues are resolved, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817 (2d Cir.1990).

In *McGee v. Bauer,* 956 F.2d 730, 736 (7th Cir.1992), the court found that the building inspector was entitled to qualified immunity based on his decision to declare a structure uninhabitable prior to a hearing. Finding undisputed facts that the structure was in disrepair, that there were excessive animals in the house, that animal waste, rats, and electrical cords running through hay on the back porch were observed, and that there was raw sewage in the basement, the court found that it was objectively reasonable for the inspector to declare house to be uninhabitable. *McGee, supra,* at 736. Further, the court found that the inspector was entitled to qualified immunity for any failure to notify the plaintiff of his right to a hearing as there was no affirmative duty placed on the inspector to provide notice of a right to a hearing, and that, the inspector would only be a witness at, not an arbiter of, any hearing that was held. *McGee, supra,* at 738.

In this case, the court has previously determined that Blakeslee lawfully entered Capozzi's home, and that it was also lawful for him to continue to inspect the home upon his viewing of the condition of the house. Similar to the facts in *McGee,* it is clear from the undisputed facts in this case that the condition of Capozzi's house was very poor, that there was no heat at the time Blakeslee was in the house, that the wood stove had flammable objects in and around it, that there was water damage to the kitchen ceiling, and that the house was full of debris of all kinds "from the floor to the ceiling and from wall to wall." *See* Exhibit B, Plaintiff's Notice of Motion. As such, the court finds that it was objectively reasonable for Blakeslee to characterize the house as uninhabitable, and to direct Capozzi that he must vacate the premises.

■ Further, the court finds that Blakeslee was not under any duty to notify Capozzi of his right to a hearing. The City of Olean Ordinance provides that the building inspector shall "appear at all hearings conducted by the fire chief and testify as to the condition of the dangerous buildings." City of Olean Ordinance § 6–239(7). While the notices posted on Capozzi's house and sent to Capozzi did not contain information regarding his right to a hearing, Blakeslee was clearly not responsible for the wording of the forms. The court finds that Blakeslee could have "reasonably assume[d] that he was not the official designated to advise [Capozzi] of his legal right to a hearing." *McGee, supra,* at 738. As such, the court finds that Blakeslee is entitled to qualified immunity for his actions relating to Capozzi's home.

■ Second, as to Defendant John Hart, at the time of the incident at issue in this case, Hart was the attorney for the City of Olean. Plaintiff's only claim against Hart is that Hart failed to take action to restore Capozzi to his residence, and that Hart failed to inform Capozzi of his right to a hearing. However, the City of Olean Ordinance does not set forth a duty on the City Attorney to provide notice to a person deprived of a property interest. That duty is placed on

the Fire Chief, pursuant to City of Olean Ordinance § 6–240(2). Nor has Plaintiff offered any caselaw establishing that such an independent duty exists under the Fourteenth Amendment. The court therefore finds that Capozzi has failed to set forth a claim under § 1983 against Hart, as Hart did not deprive Capozzi of a property interest. Further, even if had a proper claim had been raised against Hart, Hart would be entitled to qualified immunity for his actions as the court finds that it was objectively reasonable for Hart not to inform Capozzi of his right to a hearing, or to schedule such a hearing.[6]

■ Third, as to Defendant John Gibbons, Gibbons was away on vacation at the time of the December 23, 1993 incident. He returned to duty on approximately January 2, 1994. *See* Exhibit C, Plaintiff's Notice of Motion, at p. 13, ¶ 48. The City of Olean ordinance provides that the fire chief shall "upon receipt of a report of the building inspector ... give written notice to the owner ... to appear before him on the date specified in the notice ... to show cause why the building or structure reported to be a dangerous building should not be repaired, vacated, or demolished ....". City of Olean Ordinance § 6–240(1). Further, under the ordinance, the fire chief shall "hold a hearing and hear such testimony as the building inspector, the owner ... shall offer relative to the dangerous building." City of Olean Ordinance § 6–240(2). The fire chief is then required to make written findings of fact, and issue an order based upon such findings of fact. City of Olean Ordinance § 6–240(3) and (4).

It is clear in this case that no such notice was sent to Capozzi regarding his right to a hearing. Defendant claims that he never received a notice of non-compliance from the building inspector triggering his obligation to hold such a hearing. The court finds that there are disputed issues of fact relative to

the reason why Gibbons never convened a hearing, and why Capozzi was never informed as to his right to a hearing, including but not limited to what Gibbons knew of the incident, whether Blakeslee ever informed Gibbons of the incident, what steps were taken to inform Capozzi of his rights under the City of Olean ordinances, and whether Capozzi waived his right to a hearing through his attorney by a letter sent to City Attorney Hart on January 31, 1994. Accordingly, the court finds that summary judgment may not be granted in Gibbons favor.

■ However, as to Defendant Melfi, while he was acting in the capacity of Acting Fire Chief on December 23, 1993, as Gibbons was on vacation, it is clear that, on December 24, 1993, he forwarded a memo to Defendant Gibbons, informing him of the incident and what steps had been taken. Further, Capozzi was served the notice from the building inspector regarding the condition of his property on January 3, 1994, after Gibbons had returned from vacation. *See* Exhibit B, Plaintiff's Notice of Motion, Certified Mail Receipt. Therefore, the court finds that the Fire Chief's affirmative duties pursuant to the ordinance were triggered after Gibbons return, and that Melfi's actions taken following the December 23, 1993 incident were objectively reasonable, entitling him to qualified immunity for his actions.

■ Finally, as to the City of Olean, to prevail on a § 1983 claim against a municipality, a plaintiff must show that the alleged violative acts were taken pursuant to an official policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The plaintiff must also establish a "causal link" between the official policy or custom and his injuries. *Batista v. Rodriguez*, 702 F.2d 393,

---

6. Hart would not be entitled to absolute immunity as, while prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and presenting the State's case," insofar as that conduct is "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–96, 47 L.Ed.2d

128 (1976), there is no absolute immunity given to an attorney for advising government officials, as qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. *Burns v. Reed*, 500 U.S. 478, 486–96, 111 S.Ct. 1934, 1939–44, 114 L.Ed.2d 547 (1991).

397 (2d Cir.1983). "Municipal liability under § 1983 attaches where, and only where, a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Sorlucco v. New York City Police Department,* 780 F.Supp. 202, 211 (S.D.N.Y.1992) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986)).

■ Under *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), there is a two step process for imposing municipal liability under § 1983. First, the court must identify the officials or government entities that have final policy making authority for the municipality in question by "reviewing the relevant legal materials, including state and local positive law, as well [as] ' "custom or usage" having the force of law.' " *Jett, supra,* at 737, 109 S.Ct. at 2723. Second, once that legal decision is made, the jury must decide whether the officials or entities so identified have "caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedures' of the local governmental entity." *Jett, supra,* at 737, 109 S.Ct. at 2723.

■ In ascertaining the first question, the court must consider that an official with final authority in the relevant sphere makes the municipality's final decisions. *Rookard v. Health and Hospitals Corporation,* 710 F.2d 41, 45 (2d Cir.1983). Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. *Id.* An official has final authority if his decisions, at the time they are made, for practical and legal reasons constitute the municipality's final decisions. *Id.* A municipality may be liable if actions taken by a policy-making official, taken in his official capacity, violated a plaintiff's constitutional rights. *McGee, supra,* at 733.

■ In this case, the court finds that the City of Olean ordinances clearly gave the discretion to Defendant Gibbons, as the Fire Chief, as to the holding of a hearing, and the issuance of notices sufficient to provide an adequate post-deprivation remedy. As such, as Gibbons had final decision making authority over the notification and holding of a hearing regarding the decision to direct Capozzi to vacate his home, the court concludes that Gibbons was the policy-making official for the City of Olean for the actions taken in this case. The court further finds that questions of fact remain, and that, therefore, it is a jury question as to whether Gibbons' actions or inactions caused a deprivation of Capozzi's rights in such a manner as to hold the City of Olean liable under § 1983 for Capozzi's due process claims. Accordingly, the court concludes that the City of Olean should not be granted summary judgment in this matter.

### CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment is DENIED. Defendants' cross-motion for summary judgment is GRANTED as to City of Olean, New York, Department of Code Enforcement; Ronald Blakeslee; City of Olean, New York, Police Department; Patrick Brandow; Unknown Police Officer/s; City of Olean, New York, Fire Department; Paul Melfi; and, John M. Hart, Jr. Defendants' cross-motion for summary judgment is DENIED as to the City of Olean, New York, and John W. Gibbons.

SO ORDERED.